FILED

2012 SEP 30 AM 10: 10

U.S. DISTRICT COURT
NORTHERN DISTRICT COURT
NORTHERN DISTRICT OF OHIO
YOUNGSTOWN

PEARSON, J.

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| FEDERAL DEPOSIT INSURANCE CORPORATION, AS RECEIVER FOR AMTRUST BANK, | ) ) ) | CASE NO. 1:08CV2390 |
| Plaintiff, | ) ) | JUDGE BENITA Y. PEARSON |
| v. | ) ) | |
| COMMONWEALTH LAND TITLE INSURANCE COMPANY, | ) ) | **MEMORANDUM OF OPINION AND ORDER** |
| Defendant. | ) ) | [Resolving ECF Nos. 38, 44, and 54] |

This action is before the Court upon Defendant Commonwealth Land Title Insurance Company's ("CLTIC") Motion for Summary Judgment (ECF No. 38) and Plaintiff The Federal Deposit Insurance Corporation ("FDIC"), as Receiver for AmTrust Bank ("AmTrust")'s Motion for Summary Judgment (ECF No. 44). This action is also before the Court upon the FDIC's Motion to Strike Exhibits to Defendant's Reply Memorandum (ECF No. 54). The Court has been advised, having reviewed the record, the parties' briefs and the applicable law. For the reasons stated herein, the Motions for Summary Judgment are granted in part and the Motion to Strike is denied.

## I. OVERVIEW

The instant case arises from two separate transactions when Defendant issued two loan policies of title insurance through its agent Legend Land Services ("Legend Land") to AmTrust

(1:08CV2390)

Bank ("AmTrust"), formerly known as Ohio Savings Bank ("OSB"). Manhattan Mortgage was a mortgage broker for OSB. AmTrust became the holder of the mortgages at issue. The FDIC insured the accounts at AmTrust and became the receiver for AmTrust in the instant action. ECF No. 1. AmTrust is a federally chartered bank with a principal place of business in Ohio. Id. Defendant is organized under the laws of Nebraska with a principal place of business in Virginia. Id. The real property that is the basis of the dispute is located in New York City. Id.

**A. 562 West 171st Street**

AmTrust loaned funds to a borrower in the amount of $620,500 for the purchase of 562 W. 171st Street, New York, New York. Id. Legend Land processed paperwork for a loan policy of title insurance and conducted the closing. Id. Manhattan Mortgage was a mortgage broker for the bank. Id. Gus Contos ("Contos") was the settlement agent at the closing for the bank. ECF No. 44.

Legend Land received a title order for the property and assigned it an order number of LEG-1604. ECF 39-6. Legend Land issued a title commitment order on August 18, 2003. ECF No. 39-59. Legend Land prepared a policy in anticipation of issuing a title insurance policy. Id. The premium owed to Legend Land was $4,624 ($3,871.borrower's policy and $753 lender's policy). ECF 39-6. It was customary to pay the title insurance premium from the proceeds of closing at the time of the sale of the property. Id. Payment of the premium is required before the policy is issued. Id. Legend Land does not have a record of payment for the premium. Id. Legend Land states it did not issue a policy. Id.

2

(1:08CV2390)

The borrower, seller, and Contos signed the master closing instructions from the bank on August 21, 2003.  ECF No. 39-59.  On August 25, 2003, Contos issued a check to Legend Land for $1,551.25 marked for "Wallace."[1]  ECF No. 39-64.  Other checks were issued the same day to Contos, Manhattan Mortgage, and Allstate.  ECF Nos. 39-64 and 39-65.  Contos also processed a bank wire for $592,342.65 on August 25, 2003.  ECF No. 39-66.

Subsequently, the mortgage entered into default.  *Id.* at 5.  AmTrust initiated foreclosure proceedings.  *Id.*  During foreclosure research, AmTrust found problems with the title (one of which being that the property was still in the seller's name) and submitted a claim to Defendant. On August 27, 2004, Defendant's Vice President & Counsel sent a letter—the "happy foreclosure" letter—to the bank's attorney, which stated Defendant will insure the purchaser at the foreclosure sale.[2]  ECF No. 44-12.  The letter also indicated that the foreclosure may proceed without reference to the following:  two prior mortgages and a *lis pendens*.  *Id.*  The *lis pendens* action was filed nine months prior to the closing.[3]  *Id.*

---

[1]  These funds were for the mortgage tax on the property.  ECF No. 36-1.

[2]  Grail Moore ("Moore"), former Claims Counsel for Defendant, testified that a "happy foreclosure" letter is:  "Basically it's disposing of a clearance issue and representing—telling the lender to go ahead and foreclose and you do not need to, for instance, on the prior mortgages, name and serve the holder of those mortgages in your foreclosure action, and that after the foreclosure sale occurs, the company will either issue—they will either insure the third-party purchaser or issue the appropriate letter of indemnity to the title insurance underwriter for the third-party bidder."  ECF No. 34-1 at 34.

[3]  The *lis pendens* was filed November 8, 2002.  ECF No. 44.

3

(1:08CV2390)

During the foreclosure, AmTrust was not able to recover because other liens on the property existed, and AmTrust was not in first lien position. In addition, the borrower was not the title owner of record on the property. Initially, Defendant admitted coverage; however, later denied that a valid policy existed, premised on a disputed issue of fact, whether the policy premium was paid and whether a closing ever took place.

Moore, former Claims Counsel for Defendant, processed and denied the claim. ECF No. 34-1. Moore sent a fax to Ira Waltuch, who worked for Legend Land, on September 1, 2004, that stated the closing occurred on August 21, 2003, and Defendant received notice that there were problems with the title report. ECF No. 44-11. On October 14, 2008, an internal inquiry at Defendant could not find a "remit" for LEG1604 or Policy No. G32-1474616 that closed on August 21, 2003. ECF No. 39-50. "Remit" means transmission of payment from Legend Land to Defendant. ECF No. 39-67 at 41:15. On November 18, 2004, Moore sent a letter stating the claim was denied because her investigation revealed a closing never took place, and the premium was not paid. ECF No. 44-13. Moore stated the title report and policy are void. Defendant disputes the authenticity of the copies of the policy. ECF No. 48 at 6. A party testified that Defendant stopped using Legend Land as their agent because of sloppy work. ECF No. 39-67.

**B. 197 Edgecombe Avenue**

Defendant issued a title commitment to provide a mortgage title policy on 197 Edgecombe Avenue, New York, New York. Id. at 7; ECF No. 48 at 12. On April 20, 2003, AmTrust became the holder of the mortgage. Id. Defendant issued a loan policy of title insurance (policy #G32-1138175) in the value of $620,500. Id. at 7, Attach. 4, Ex. B. AmTrust,

4

(1:08CV2390)

however, loaned more than the value of the policy to the borrower.  ECF No. 44-1.  The borrower

defaulted on the mortgage, and Amtrust initiated foreclosure proceedings.  *Id.* at 8.  AmTrust

submitted a claim ("Claim No. 1") because a title search revealed an existing New York City *In

Rem* Foreclosure Proceeding wherein a *lis pendens* was filed.  ECF No. 44-7.

Mortgage Electronic Registration Systems, Inc. ("MERS") obtained the Judgment of

Foreclosure.  ECF No. 38 at 11.  MERS was the Nominee for the OSB.  ECF No. 44-9.  On July

23, 2004, a Judgment of Foreclosure and Sale was entered allowing AmTrust to sell the property.

*Id.* at 8.  During October of 2004, AmTrust obtained an appraisal on the property for $600,000.

ECF No. 44-1.  On October 29, 2004, a third party initially agreed to purchase the property for

$558,000, but later withdrew from the purchase because the property had a Housing Preservation

and Development Section 7-A Administrator assigned to it.[4]  *Id.* at 9.  A title search revealed that

the Department of Housing Preservation and Development of the City of New York filed two *lis

pendens* prior to Defendant issuance of the title insurance policy.  ECF No. 39-3.  In addition,

there were judgments against the prior owners that were still on the record.  *Id.*  Subsequently,

---

[4]  Through the 7A Program, administrators are appointed by the Court (pursuant to
New York State Law) to operate privately owned buildings that have been abandoned by
their owners, resulting in conditions that are dangerous to the tenants' life, health and
safety. The administrators act under Court Order to collect rents and use the money to
provide essential services to the tenants and make necessary repairs. Experienced housing
organizations, rather than individuals, are selected to provide 7A management services.In
some 7A buildings, HPD offers a limited amount of 7A Financial Assistance (7AFA) to
repair or replace major systems or make other repairs. HPD monitors the activities of 7A
administrators and administers the 7AFA loan program.   (availible at
http://www.nyc.gov/html/hpd/html/owners/supporting-7a.shtml (last visited Aug. 15,
2012)); *See also Zev Cohen, LLC v. Fidelity Natl. Tit. Ins. Co.*, 831 N.Y.S.2d 689 (N.Y.
Sup. Ct. 2007)*.

(1:08CV2390)

AmTrust filed a claim ("Claim No. 2") with Defendant on February 22, 2005.  *Id.*.  Moore

testified that the claim had not been denied, and in her opinion should not be.  ECF No. 34-1 at

172.

On the face of the policy, it states the policy insures against loss or damage sustained or

incurred by reasons of:

> 1.  Title to the estate or interest described in Schedule A being vested other than
> as stated therein;
> 2.  Any defect in or lien or encumbrance on the title;
> 3.  Unmarketability of the title;
> 4.  Lack of a right of access to and from the land;
> 5.  The invalidity or unenforceability of the lien of the insured mortgage upon the
> title;
> 6.  The priority of any lien or encumbrance over the lien of the insured mortgage;
> 7.  Lack of priority of the lien of the insured mortgage over any statutory lien for
> services, labor or materials: (a) arising from an improvement or work related to
> the land which is contracted for or commenced prior to Date of Policy; or (b)
> arising from an improvement or work related to the land which is contracted for or
> commenced subsequent to the Date of Policy and which is financed in whole or in
> part by proceeds of the indebtness secured by the insured mortgage which at Date
> of Policy the insured had advanced or is obligated to advance;
> 8.  The invalidity or unenforceability of any assignment of the insured mortgage,
> provided the assignment is shown in Schedule A, or the failure of assignment
> showing in Schedule A to vest title to the insured mortgage in the named insured
> assignee free and clear of all liens.

ECF No. 1-4.

In an attachment to the policy, the parties made changes to the boilerplate language of the

policy.  The parties agreed to delete number seven, as listed above, and the following was

submitted:  "7.  Any statutory lien for services, labor or materials furnished prior to the date

hereof, and which has now gained or which may hereafter gain priority over the estate or interest

6

(1:08CV2390)

of the insured as shown in Schedule A of this policy."  ECF No. 1-4.  The parties also agreed to

delete paragraph number six under "Exclusions From Coverage."  Paragraph number six stated:

> Any statutory lien for services, labor or materials (or the claim of priority of any
> statutory lien for services, labor or materials over the lien of the insured mortgage)
> arising from an improvement or work related to the land which is contracted for
> and commenced subsequent to Date of Policy and is not financed in whole or in
> part by proceeds of the indebtedness secured by the insured mortgage which at
> Date of Policy the insured has advanced or is obligated to advance.

ECF No. 1-4.  The following was added to paragraph seven of the Conditions and Stipulations of

the policy:  "If the recording date of the instruments creating the insured interest is later than the

policy date, such policy shall also cover intervening liens or incumbrances, except taxes,

assessments, water charges and sewer rents."  ECF No. 1-4.

## II.  CHOICE OF LAW

Section 1345, 28 U.S.C. provides federal question jurisdiction to the FDIC as a party

unless Congress has promulgated an exception.  12 U.S.C. § 1819(b)(2)(D) provides such an

exception, which is  when "only the interpretation of the law of such State is necessary."  *Id.*  The

claims in the instant dispute are neither federal questions, nor do they fall within the *Grable*

exception.[5]  The claims are based on contract law and tort law—state law causes of action.

Accordingly, the Court will now proceed using diversity as grounds for subject matter

jurisdiction.  *See* 28 U.S.C. § 1332.

The instant case involves two corporations whose principal places of business are in

different states.  The parties perform business in different states.  The FDIC asserts four claims,

---

[5] *Grable & Sons Metal Products, Inc. v. Darue Eng'g & Mfg.,* 377 F.3d 592 (6th
Cir. 2004), *aff'd,* 545 U.S. 308 (2005).

7

(1:08CV2390)

two are based on contract law and two are based on tort law.  If there is no federal statute on point, and the state rule is substantive in nature, the state rule should be applied.  *See Erie R.R. Co. v. Tompkins*, 304 U.S. 64 (1938).  Substantive law defines a parties rights and obligations.

The parties have not contractually agreed on a choice of law.  The Court must use the conflict of law rules in its forum to decide whether Ohio or New York law applies to the instant case.  *See Klaxon v. Stentor Elec. Mfg. Co., Inc.*, 313 U.S. 487, 496 (1941); *see also Security Ins. Co. v. Kevin Tucker & Assocs., Inc.*, 64 F.3d 1001, 1005 (6th Cir.1995).  Under Ohio law, courts apply interest-analysis tests set forth in the Restatement (Second) of Conflict of Laws to resolve conflict of laws issues.  *See, e.g.*, *Gries Sports Enters. v. Modell*, 473 N.E.2d 807, 810 (Ohio 1984).  Whether it is deemed to be a tort case or a contract case determines which of the Restatement's interest-analysis tests an Ohio court must apply.  *Miller v. State Farm Mut. Auto. Ins. Co.*, 87 F.3d 822, 824 (6th Cir. 1996).

> In applying the Restatement, the court must look to the restatement section that corresponds to each claim.  *See Macurdy v. Sikov & Love, P.A.*, 894 F.2d 818, 820 (6th Cir. 1990) (determining which state's law applied to the plaintiff's claims using different Restatement sections; for plaintiff's fraud claim the court used the Restatement section on fraud and misrepresentation (§ 148) and used the section on contracts (§ 188) to analyze the breach claim).  Finally, one state's law need not be applied to all of the claims.  *See Cheatham v. Thurston Motor Lines*, 654 F.Supp. 211, 215 (S.D.Ohio 1986) ("Tennessee law will apply to Plaintiffs' negligence claim . . . Ohio law will apply to the products liability claims").

Lewis v. Horace Mann Ins. Co., 410 F. Supp. 2d 640, 653-54 (N.D. Ohio 2005).

**A.  The Breach of Contract Claims**

If an action is based in contract, Restatement (Second) of Conflict of Laws § 188 (1971) applies, and the law of the state where the contract was made presumptively controls.

(1:08CV2390)

*Nationwide Mut. Ins. Co. v. Ferrin*, 487 N.E.2d 568, 569 (Ohio 1986); *see also Daniels v. Wausau Ins. Companies*, 207 F. Supp.2d 707 (N.D. Ohio 2002) (applying Ohio law).  Ohio choice of law rules mandate that the law of the state with the more significant relationship to a contract should govern disputes arising from it.  *Ohic Ins. Co. v. Employers Reinsurance Corp.*, 694 F. Supp.2d 794 (S.D. Ohio 2010).  In a contract action, when determining which state has the most significant relationship with transaction and parties under Ohio conflict-of-law rules, Restatement (Second) of Conflict of Laws § 188 (1971) provides factors the Court must consider including:  (1) the place of contracting; (2) the place of negotiation; (3) the place of performance; (4) the location of the subject matter; and (5) the domicile, residence, nationality, place of incorporation, and place of business of the parties.  *Irondale Indus. Contractors, Inc. v. Virginia Sur. Co., Inc.*, 754 F. Supp.2d 927 (N.D. Ohio 2010); *see also* Restatement (Second) of Conflict of Laws § 188 (1971).

The factors "only provide a broad general framework for the resolution of choice of law issues in the context of a contract dispute."  *Int'l Ins. Co. v. Stonewall Ins. Co.*, 86 F.3d 601, 606 (6th Cir. 1996).  "Within that framework, a judge must balance principles, policies, factors, weights, and emphases to reach a result, the derivation of which, in all honesty, does not proceed with mathematical precision."  *Id.*

Upon application, the Court finds that the place of contracting was in New York for both mortgages.  The place of negotiation was in New York.  The place of performance was in New York.  The location of the subject matter is in New York, where both properties are located.  The place of incorporation and principal place of business of the parties are in Ohio and Virginia.

(1:08CV2390)

Courts have also considered the protection of justified expectations for analysis of choice of law. *See Int'l Ins. Co. v. Stonewall Ins. Co.*, 863 F. Supp. 599, 603 (S.D. Ohio 1994), *aff'd*, 86 F.3d 601 (6th Cir. 1996).

Analyzing the parties' justified expectations also favors the application of New York law in regard to the contract matters.  When "an insurance contract extended coverage across the United States and omitted a choice of law provision, that omission mean[t] that the insurer intended its coverage to be governed by the state in which the claimant was using his vehicle." *See Id.*  Here, Defendant provides insurance across the United States, and the contract omitted a choice of law provision.  The parties' expectations supports the application of New York law, as well, because of the real properties' physical locations.  The FDIC also is entitled to protection of its justified expectations as receiver for AmTrust.  AmTrust's principal place of business was in Ohio, but it partnered with a company in New York that performed mortgages brokerage services.  It would have been reasonable for AmTrust to expect that contracts ratified in New York are protected under New York law.  Accordingly, New York Law applies to the breach of contract claims.

10

(1:08CV2390)

**B.  The Tort Claims**

The Restatement (Second) of Conflict of Laws § 148 (1971) governs the FDIC bad faith denial claim.[6]  *See Macurdy*, 894 F.2d at 820-21.  Furthermore, because the representations and reliance did not take place in the same state, the Court will apply § 148(2).

Restatement (Second) of Conflict of Laws § 148(2) (1971) provides:

> When the plaintiff's action in reliance took place in whole or in part in a state other than that where the false representations were made, the forum will consider such of the following contacts, among others, as may be present in the particular case in determining the state which, with respect to the particular issue, has the most significant relationship to the occurrence and the parties:
> > (a) the place, or places, where the plaintiff acted in reliance upon the defendant's representations,
> > (b) the place where the plaintiff received the representations,
> > (c) the place where the defendant made the representations,
> > (d) the domicil, residence, nationality, place of incorporation and place of business or the parties,
> > (e) the place where a tangible thing which is the subject of the transaction between the parties was situated at the time,[7] and
> > (f) the place where the plaintiff is to render performance under a contract which he has been induced to enter by the false representations of the defendant.

The application of the factors listed in this section dictate that New York law must be applied to the FDIC's bad faith denial claims:  (a) if AmTrust acted in reliance upon Defendant's

---

[6]  "The rule of this Section applies to actions brought to recover pecuniary damages suffered on account of false representations, whether fraudulent, negligent or innocent."  Restatement (Second) of Conflict of Laws § 148, cmt. a; *see also Macurdy*, 894 F.2d at 820-21.

[7]  "This contact is of particular importance when the subject of the transaction is land."  *Id.* at cmt. i; "When the loss is pecuniary in its nature, the place of loss is far more difficult to locate than when the damage consists of physical injury to persons or to tangible things."  *Id.* at cmt. c; *see also Dallman Acquisition, LLC v. Dallman*, No. 2:10-cv-007, 2011 WL 798093 (S.D. Ohio March 1, 2011).

(1:08CV2390)

representations then it did so in New York; (b) AmTrust received the representations in Ohio; (c)

Defendant made representations from the claims office in New York; (d) as laid out above,

AmTrust was an Ohio corporation with its principal place of business in Ohio, whereas

Defendant is a Nebraska corporation with its principal place of business in Virginia; (e) both

parties were aware the properties were located in New York, and the policies in dispute are New

York policies; and (f) AmTrust was to pay for the title insurance premiums in New York.

New York not only has more contacts, but also New York has the more important

contacts. *Id.*, cmt. j. ("If any two of the above-mentioned contacts, apart from the defendant's

domicil, state of incorporation or place of business, are located wholly in a single state, this will

usually be the state of the applicable law with respect to most issues.").  Accordingly, the Court

concludes that New York's substantive law will also be applied to the FDIC's bad faith denial

claims.  *See Lewis v. Horace Mann Ins. Co.*, 410 F. Supp. 2d 640, 655-56 (N.D. Ohio 2005).

The factors delineated in the Restatement (Second) of Conflict of Laws § 6 (1971), to

which § 148 (1) refers, may rebut the presumption that New York law applies to the FDIC's bad

faith denial claim.  The Court must consider the following choice of law principles:

> (a) the needs of the interstate and international systems,
> (b) the relevant policies of the forum,
> (c) the relevant policies of other interested states and the relative interests of those
> states in the determination of the particular issue,
> (d) the protection of justified expectations,
> (e) the basic policies underlying the particular field of law,
> (f) certainty, predictability and uniformity of result, and
> (g) ease in the determination and application of the law to be applied.

Restatement (Second) of Conflict of Laws § 6(2)(a-g) (1971).

(1:08CV2390)

The FDIC asserts a cause of action for the tort of bad faith, which Ohio law recognizes; however, New York Law does not. The FDIC argues Ohio law applies. If the FDIC can demonstrate that Ohio has a more significant relationship to the action then FDIC may overcome the presumption that the law of the place where the injury occurred will be applied to a tort action. *Muncie Power Products, Inc. v. United Technologies Auto., Inc.*, 328 F.3d 870, 874 (6th Cir. 2003). As analyzed above, New York bears a more significant relationship to the action than either of the locations of the parties. The Court has analyzed the protection of justified expectations (factor d). Furthermore, because the FDIC is a federal entity and the sole plaintiff in interest, the Court finds that fact minimizes Ohio's interest in resolving a dispute from a failed federal savings bank that was based in Ohio.[8] The factors in § 6 do not rebut the presumption that New York law applies to the bad faith denial claims. The Court does not find that the FDIC will be prejudiced if it is deprived of this claim because it argues, in the alternative, similar theories that may allow it to recover under New York law. After considering the above the Court concludes New York law controls the instant action, for both the tort and contract claims.

---

[8] On December 4, 2009, the Office of Thrift Supervision closed AmTrust Bank, and the FDIC was named Receiver. All deposit accounts were transferred to the New York Community Bank, Westbury, New York. On December 5, 2009, the former AmTrust Bank locations reopened as branches of New York Community Bank. The Federal Deposit Insurance Corporation, available at http://www.fdic.gov/bank/individual/failed/amtrust.html (last visited September 28, 2012). A law firm in New Jersey that represented OSB received the claim denial letter. The claims at issue have passed through three entities. Manhattan Mortgage, acting as mortgage broker for OSB, originated the loans in New York. Subsequently, AmTrust became the holder of the mortgages. AmTrust's principal place of business is Ohio. The FDIC, a stateless federal entity, was substituted for AmTrust under Fed. R. Civ. P. 25(c). The FDIC retains the rights to causes of action that AmTrust alleged. *See* 12 U.S.C. § 1821(d)(2)(A)(i).

(1:08CV2390)

### III. STANDARD OF REVIEW FOR SUMMARY JUDGMENT

Summary judgment is appropriately granted when the pleadings, the discovery and disclosure materials on file, and any affidavits show "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Johnson v. Karnes*, 398 F.3d 868, 873 (6th Cir. 2005). The moving party is not required to file affidavits or other similar materials negating a claim on which its opponent bears the burden of proof, so long as the movant relies upon the absence of the essential element in the pleadings, depositions, answers to interrogatories, and admissions on file. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The moving party must "show that the non-moving party has failed to establish an essential element of his case upon which he would bear the ultimate burden of proof at trial." *Guarino v. Brookfield Twp. Trustees.*, 980 F.2d 399, 403 (6th Cir. 1992).

Once the movant makes a properly supported motion, the burden shifts to the non-moving party to demonstrate the existence of a genuine dispute. An opposing party may not simply rely on its pleadings; rather, it must "produce evidence that results in a conflict of material fact to be resolved by a jury." *Cox v. Ky. Dep't. of Transp.*, 53 F.3d 146, 150 (6th Cir. 1995). The non-moving party must, to defeat the motion, "show that there is doubt as to the material facts and that the record, taken as a whole, does not lead to a judgment for the movant." *Guarino*, 980 F.2d at 403. In reviewing a motion for summary judgment, the court must view the evidence in the light most favorable to the non-moving party when deciding whether a genuine issue of material fact exists. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986); *Adickes v. S.H. Kress & Co.*, 398 U.S. 144 (1970).

14

(1:08CV2390)

The United States Supreme Court, in deciding *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986), stated that in order for a motion for summary judgment to be granted, there must be no genuine issue of material fact. *Id.* at 248. A fact is "material" only if its resolution will affect the outcome of the lawsuit. In determining whether a factual issue is "genuine," the court must decide whether the evidence is such that reasonable jurors could find that the non-moving party is entitled to a verdict. *Id.* Summary judgment "will not lie . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* To withstand summary judgment, the non-movant must show sufficient evidence to create a genuine issue of material fact. *Klepper v. First Am. Bank*, 916 F.2d 337, 342 (6th Cir. 1990). The existence of a mere scintilla of evidence in support of the non-moving party's position ordinarily will not be sufficient to defeat a motion for summary judgment. *Id.*

When evaluating cross-motions for summary judgment, the Court is obligated to analyze each motion on its own merits and view the facts and inferences in the light most favorable to the nonmovant. *Westfield Ins. Co. v. Tech Dry, Inc.*, 336 F.3d 503, 506 (6th Cir. 2003).

## IV. DISCUSSION

Title insurance is insurance against loss from defects in the title to real property. It operates to protect a purchaser or mortgagee against defects or encumbrances on titles which are in existence at the time the insured takes her title. *Mayers v. Van Schaick*, 268 N.Y. 320, 197 N.E. 296 (1935); *Trenton Potteries Co. v. Title Guarantee & Trust Co.*, 176 N.Y. 65, 68 N.E. 132 (1903). A title insurance policy is a contract of indemnity. *Diversified Mortgage Investors v. U.S. Life Title Insurance Company of New York*, 544 F.2d 571, 575 (2d Cir. 1976).

15

(1:08CV2390)

## A.  Whether Defendant is Breached any of its Obligations under the Title Insurance Policies

One who seeks to recover on an insurance policy generally has the burden of demonstrating coverage under the policy and then proving a loss.  *See A.B. Med. Services, PLLC v. State Farm Mut. Auto. Ins. Co.*, 7 Misc.3d 822, 795 N.Y.S.2d 843, 847 (Civ. Ct. 2005). Strong federal policy dictates that the FDIC, as corporate insurer, takes greater rights than the failed bank.  *In re Jeter*, 48 B.R. 404, 410 (Bankr.N.D. Tex. 1985).

### 1.  562 West 171st Street[9]

In order to survive a motion for summary judgment, the FDIC may meet its burden by showing that a valid contract was formed, and Defendant's failure of consideration defense is without merit.  The parties dispute whether Defendant was paid the premium for the title insurance policy.  Defendant argues that Contos, the attorney who conducted the closing, failed to pay the premium for the title insurance.  ECF No. 38 at 10.  The FDIC argues that Legend Land, Defendant's agent, received payment for the title insurance policy, but failed to remit it to Defendant.  The original version of the policy was destroyed.  ECF No. 39-1 at 9.  Contos testified he does not recall if he had possession of the policy.  ECF No. 36-1 at 70:9.

#### a.  Whether a Valid Contract Existed Between the Parties

Title insurance policies are contracts.  A contract is a promise for the breach of which the law gives a remedy.  *See* Restatement (Second) of Contracts § 1 (1981).  Valid contracts include

---

[9]  The FDIC's Motion to Strike (ECF No. 54) two letters from the evidence is moot because the within ruling does not rely on any evidence that the FDIC moves the Court to strike.

(1:08CV2390)

offer, acceptance, and consideration.  *Kowalchuk v. Stroup*, 61 A.D.3d 118, 873 N.Y.S.2d 43, 46 (2009).  Consideration is basically something given or promised—quid pro quo—a bargained-for legal benefit or detriment given in exchange.  *Holt v. Feigenbaum*, 52 N.Y.2d 291, 419 N.E.2d 332, 336 (1981); *see also* Restatement (Second) of Contracts § 75 (1981) (stating "a promise which is bargained for is consideration if, but only if, the promised performance would be consideration").  "If the requirement of consideration is met, there is no additional requirement of (a) gain, advantage, or benefit to the promisor or a loss, disadvantage, or detriment to the promisee; or (b) equivalence in the values exchanged; or (c) "mutuality of obligation."  Restatement (Second) of Contracts § 79 (1981).

The FDIC must demonstrate that there was an offer, acceptance, and the agreement was supported by consideration.  Defendant argues that in order to survive a summary judgment, the FDIC must show that a premium was paid.  This argument is incorrect because it assumes that payment of the premium is the only consideration sufficient for a valid contract formation.  There are, however, many forms of consideration sufficient for valid contract formation.  Defendant's argument ignores an established principle of contracts law that bargained-for-reciprocal promises of performance are sufficient consideration that support a valid contract.

The bank bargained for an agreement whereby Legend Land would perform title research, issue a title commitment, and anticipate the issuance of a title insurance policy.  An agreement is a manifestation of mutual assent on the part of two or more persons.  "A bargain is an agreement to exchange promises or to exchange a promise for a performance or to exchange performances."  *Id.*, § 3 (1981).  The consideration here was the bank's promise to pay a title insurance premium

17

(1:08CV2390)

that induced Legend Land's detriment.[10]  Legend Land performed title research and issued a title commitment before payment was due indicating that it relied upon that bank's promise to pay Legend Land for its bargained-for detriment, otherwise it would not have performed the work.

Defendant relies on *GMAC Mortg. Corp. of Pa. v. Weisman*, No. 95 CIV. 9869(JFK), 1998 WL 132791 (S.D.N.Y. March 23, 1998).  In *GMAC*, a title insurance premium was not paid because the account on which the check was drawn had insufficient funds, and the court held that the "failure to pay the title insurance premiums voided the policies because there was a complete failure of consideration." *Id.* at *9.  The court in that case found the payment to be a failed condition precedent, which resulted in forfeiture of the policy. *Id.*

*GMAC* is distinguishable from the case at bar in several ways.  Primarily, there was evidence of bad faith in *GMAC* on the behalf of the person who owed the balance of the premium, and in the instant case, there is no evidence of bad faith on the banks behalf.  The record does not contain evidence of a check drawn on an account with insufficient funds.  Moreover, in *GMAC*, a representative of the buyer had notice there was a problem, and the obligations had not been fulfilled. *Id.* at *2.  The bank in the instant case did not have notice

---

[10]  It is not disputed that Legend Land had an agency relationship and that it could bind Defendant to a contract.  Agency is the relationship that results when one party agrees that another person or entity may act on its behalf.  12 Williston on Contracts, Section 35:1 (4th ed.). The former becomes the "principal," and the latter is the "agent." Generally speaking, if the agent enters into a contract on behalf of the principal, the principal will be bound by the terms of that contract, so long as the agent was acting with actual or implied authority to enter into the contract.  All that is required to form an agency relationship is consent by both parties. *Mortgage Network, Inc. v. Ameribanc Mortg. Lending, LLC*, 177 Ohio App.3d 733, 738 (Ohio App. 10th Dist. 2008).

(1:08CV2390)

before the claim was denied that financial obligations remained to satisfy the title insurance

premiums due Defendant.

Defendant argues a closing never occurred. Evidence, however, indicates there was a

closing. Defendant argues that the FDIC must produce the original title insurance policy to prove

that the contract is valid. ECF No. 48 at 9. This argument is incorrect, even if the contract was

written in invisible ink and has since disappeared, this disappearance neither insults the validity

of the contract nor fails muster under the Statute of Frauds. *See* Restatement (Second) of

Contracts § 110 (1981). The FDIC does not need to show proof Defendant received payment for

the policy. Requiring the FDIC to prove payment was received on Defendant's ledger could be

an insurmountable hurdle for the FDIC because Defendant and Legend Land are in control of

their ledgers. The FDIC is not required to show proof of a canceled check or some other

method because of the nature of its position as receiver for AmTrust. When the Office of Thrift

Supervision transitions banks, evidence may be lost in that necessary process. It would be

unreasonable to expect the FDIC to produce this evidence and may expose it to unjust prejudice.

A valid contract existed that was enforceable, but voidable. "A voidable contract is one

where one or more parties have the power, by a manifestation of election to do so, to avoid the

legal relations created by the contract, or by ratification of the contract to extinguish the power of

avoidance." Restatement (Second) of Contracts § 7 (1981). "An unenforceable contract is one

for the breach of which neither the remedy of damages nor the remedy of specific performance is

available, but which is recognized in some other way as creating a duty of performance, though

19

(1:08CV2390)

there has been no ratification." Restatement (Second) of Contracts § 8 (1981). The parties did

not express intent to void the contract.

### b. Whether Defendant's Defense of Failure of Consideration has Merit

Failure of consideration is the failure to perform a promise that was a condition precedent

to the maker's performance. *Langley v. FDIC*, 484 U.S. 86 (1987). Failure of consideration

exists when one who has promised to give some performance fails without his or her fault to

receive in some material respect the agreed quid-pro-quo for that performance. When there is a

failure of consideration, there is originally a contract when the agreement is made, but because of

some supervening cause, the promised performance fails, and the defendant has the burden of

proof when failure of consideration is asserted as a defense. 3 Williston on Contracts § 7:11 (4th

ed.).

A condition is an event, not certain to occur, which must occur, unless its non-occurrence

is excused, before performance under a contract becomes due. Restatement (Second) of

Contracts § 224 (1981). "Under New York state law, in the absence of unambiguous language, a

condition will not be read into the agreement." *Ginett v. Computer Task Group*, 962 F.2d 1085,

1099 (2d Cir. 1992). The payment of the policy was a condition precedent to the performance of

Defendant's duty to indemnify the FDIC upon a successful claim. *GMAC*, 1998 WL 132791 at

*9. (holding payment of the premium was a condition precedent to liability). "Whether a

particular provision constitutes a condition or a covenant is determined by the intention of the

parties." *Ponnapula v. CBC Co., Inc.*, No. 91-5786, 1992 WL 5433, at *2 (6th Cir. 1992). The

20

(1:08CV2390)

intention of the parties is derived by looking to "the circumstances of the particular transaction." *Id.* Any ambiguity is to be strictly construed against the drafter, in this case Defendant. *Id.*

To the extent that the non-occurrence of a condition would cause disproportionate forfeiture, a court may excuse the non-occurrence of a condition unless its occurrence was a material part of the agreed exchange. Restatement (Second) of Contracts § 229 (1981). Because the premium payment was a material part of the agreed exchange, it cannot be waived by excuse of condition. A constructive condition existed that imputed a duty on Defendant to notify the bank of problems with the policy. At minimum, Defendant had a duty to notify the bank of policy termination. The Court may impose, as a matter of law, a term as a condition in order to ensure fairness.[11] *See Nat'l Fuel Gas Distribution Corp. v. Hartford Fire Ins. Co.*, 28 A.D.3d 1169, 814 N.Y.S.2d 436, 437 (2006); *Edelman Arts, Inc. v. Art Int'l (UK) Ltd.*, 841 F. Supp. 2d 810, 824 (S.D.N.Y. 2012); *See also* Restatement (Second) of Contracts § 226 (1981). Only substantial compliance is required to satisfy a constructive condition; however, at no time prior to AmTrust's filing a claim did Defendant notify AmTrust of any delinquency or insufficiency in premiums or other funds. Defendant did not satisfy the constructive condition. Defendant issued the "happy foreclosure" letter that misled the FDIC. Accordingly, Defendant breached the contract.

---

[11] "When a condition is included for the benefit of one party to a contract, the other party may not use the non-occurrence of the condition to avoid the contract." *Kapur v. Stiefel*, 264 A.D.2d 602, 695 N.Y.S.2d 330, 332 (1999).

(1:08CV2390)

### c.  Equitable Estoppel

Defendant is estopped from denying the claim premised on non-remittance of the premium and asserting a defense of failure of consideration.  "The three elements . . . [of] equitable estoppel are (1) a misrepresentation by the plaintiff, (2) reasonable reliance by the defendant, and (3) prejudice."  *Veltri v. Bldg. Serv. 32B-J Pension Fund*, 393 F.3d 318, 326 (2d Cir. 2004).

On August 27, 2004, Defendant's Vice-President and Counsel, in response to the claim, sent a letter, the "happy foreclosure" letter, to the bank stating "please be advised that you may proceed with your foreclosure action without reference" to the discovered discrepancies.  The letter did not state any problems with the insurance policy.  The letter went on to state:  "This Company will insure the purchaser at the foreclosure sale without raising an exception as to the aforementioned item, or in the alternative the company will provide the purchaser's title insurance underwriter with the appropriate letter of indemnity to allow said item to be omitted."

Defendant was aware of the true facts.  On November 18, 2004, Defendant's claims department formally denied the claim because there was no evidence of remittance of the premium from Legend Land.  ECF No. 39-14.  Defendant had an intention that the bank would rely on the "happy foreclosure" letter in order to proceed with foreclosure proceedings. Defendant's conduct toward the bank is such that the FDIC has a right to believe that Defendant's conduct is so intended.  The letter expressly stated "you may proceed with your foreclosure action without reference."  The bank was unaware of the policy status, which Defendant represented as void.  The original letter to Defendant included a copy of a settlement

22

(1:08CV2390)

statement and a title commitment, which shows the bank believed there were no issues with the title insurance policy.  The FDIC detrimentally and justifiably relied on the "happy foreclosure" letter, which exposed AmTrust to prejudice.  Defendant argues that the FDIC has not relied on the "happy foreclosure" letter.  To the contrary, reliance on the letter is germane to the claim.  The bank would have taken a different course of action had Defendant denied coverage rather than issue the "happy foreclosure" letter.  The letter permitted the bank to proceed to foreclosure legitimately believing it had the assurances of its carrier behind it.

Defendant's conduct of issuing the "happy foreclosure" letter was a misrepresentation of material fact to AmTrust.  The "happy foreclosure" letter prejudiced the FDIC as a result of AmTrust's reasonable reliance on the letter.  The July 27, 2004 letter provided notice to OSB that it reasonably believed was a title commitment that issued on August 12, 2003.  The bank believed that Defendant had placed its mortgage as a valid first lien on the title.  Additionally, the letter indicated that a third-party title search showed the following discrepancies:  (1) two prior mortgages and (2) a prior *lis pendens*; both discrepancies prevented the bank's first-lien position.  ECF No. 39-7.  The bank also found that its mortgage was not of record, and the bank informed Defendant that its first lien position was impaired.

Defendant argues that the "happy foreclosure" letter is not the source of the loss because the FDIC did not have a recorded deed from the owner of the property to its borrow of record; instead, Defendant argues the loss is from Contos transferring the funds to a disbarred lawyer.  ECF No. 48 at 9.  Defendant argues that the FDIC has not proved AmTrust relied on the "happy foreclosure" letter.  The letter represented to the FDIC that a valid policy existed.  Defendant

23

(1:08CV2390)

argues that the "happy foreclosure" letter is not the cause of the loss, but Contos is the reason the FDIC suffered the loss. Defendant's failure to properly place the mortgage in first lien position caused the loss. Had AmTrust's lien been in the first lien position, it would have recovered its damages with title to the property. At no time prior to AmTrust's filing a claim did Defendant notify AmTrust of any delinquency or insufficiency in premiums or other funds. *Id.* at 14.

Accordingly, the Court grants the FDIC's Motion for Summary Judgment in regard to Count I; and denies Defendant's Motion for Summary Judgment as to Count I.

### 2. 197 Edgecombe Avenue

For this property, Defendant admits that a policy exists, but denies that it breached the contract. ECF No. 48. Defendant contends that the policy does not cover the existence of a 7-A administrator. *Id.* In the alternative, Defendant argues that if the FDIC can prove the policy covered the existence of a 7-A administrator, then the FDIC has not shown any loss as a result. *Id.*

The burden is on the insurer to demonstrate that the exclusion applies in the particular case and that the policy language relied upon by the insurer in support of the exclusion is "subject to no other reasonable interpretation." *Topor v. Erie Ins. Co.*, 28 A.D.3d 1199, 816 N.Y.S.2d 631, 633 (2006). Defendant, however, is liable for matters affecting the title unless the particular defect is specifically excepted from coverage, even if the matter effecting the title consists of a hidden defect. *See Citibank, N.A. v. Commonwealth Land Title Ins.*Co., 228 A.D.2d 635, 645 N.Y.S.2d 826 (1996).

24

(1:08CV2390)

The FDIC argues that it was critical that Defendant secure the loan amount by placing the mortgage in first-lien position. ECF No. 44 at 6. Defendant argues that the appointment of a 7-A administrator is not a covered matter, and AmTrust is not the real party in interest entitled to enforce the insurance contract. ECF No. 38 at 11. Defendant also argues that because the FDIC has failed to provide the original policy, Defendant is not liable. AmTrust does not possess the original version of the title policy, but asserts Defendant's agent delivered it to the closing agent. ECF No. 39-1. Both parties, however, have produced copies of the policy.

### a. Whether any of the FDIC's Claims are Covered Matters Under the Policy

AmTrust discovered a 7-A administrator and existing tax foreclosure proceeding on the property. ECF No. 44-1 at 6. Both issues have impaired the FDIC from successfully foreclosing on the property. As a result of the 7-A Administrator and the tax foreclosure, Amtrust filed two claims with Defendant. Defendant has not previously issued a denial of the claims, but Defendant denies the claims in its Answer (ECF No. 5) to the Complaint.

The Court finds the appointment of a 7-A administrator is a covered matter under the title insurance policy. "The appointment of an article 7-A administrator deals with a statutory managing agent, charged with the duty to collect rents and improve the property." *Zev Cohen, LLC v. Fidelity Natl. Title Ins. Co.*, 15 Misc. 3d 798, 804, 831 N.Y.S.2d 689 (N.Y. Sup. Ct. 2007) "The article 7-A administrator may borrow money from the New York City Department of Housing Preservation and Development for repairs." *Id.* "The appointment of an article 7-A Administrator does create a special lien, it is a lien that is not required to be listed in a title

25

(1:08CV2390)

report. *Id.* The "7-A Administrator is clearly a person in possession, even if only to collect the rents and administer the property." *Id.* at 806.

"A court-appointed administrator required under state law to collect rents in a multiple unit building and use those rents under court approval to remedy conditions dangerous to life, health or safety is not an encumbrance under a title insurance policy." 9f-210f Appleman on Insurance § 5209. In *Zev Cohen*, the plaintiff argued a 7-A administrator was an encumbrance. 831 N.Y.S.2d at 689. That court found that a 7-A administrator is not a defect, lien, or encumbrance on a title for purposes of a title insurance policy for several reasons. The policy had an exclusion that stated: "This policy does not insure against loss or damage . . . which arise by reason of: 1. Rights of tenants or persons in possession, if any" *Id.* at 695. The court reasoned that the article 7-A administrator was a "person in possession." *Id.* Additionally, because the 7-A administrator was not listed on the title report, the court reasoned that if the plaintiff had exercised due diligence and inspected the property, he would have learned of the administrator. *Id.* at 694. The policy was an owner's policy, not a loan policy, as in the instant case. *Id.* at 690.

*Zev Cohen* is distinguishable from the case at bar for several reasons. The title insurance policy at issue does not have an express exclusion for "persons in possession." On the contrary, the parties made changes to the boilerplate policy language indicating that the parties considered the defects listed in the title report, which listed the 7-A administrator. Thus, the Court finds that it was within the intention of the parties for the title insurance policy to cover the title report findings, including the 7-A administrator.

(1:08CV2390)

Moreover, the title report in *Zev Cohen* did not list the 7-A administrator, so it was not in the contemplation of the parties.  The policy at issue is also unlike the *Zev Cohen* policy in that it expressly provides coverage for losses attributable to the "[l]ack of priority of the lien of the insured mortgage over any statutory lien for services, labor or material:  (a) arising from an improvement or work related to the land which is contracted for or commenced prior to Date of Policy . . . ."  ECF No. 1-4.  The 7-A administrator's lien falls squarely within this provision.  Consequently, the *Zev Cohen* court's reasoning is inapplicable here.

The Court finds that the FDIC has incurred and sustained a loss because the interest in the property was vested in something other than as stated in the policy, which caused unmarketability of the title.  The policy for the property at issue does protect against "loss or damage . . . sustained or incurred by the insured by reason of  title to the estate or interest as described in Schedule A being vested other than as stated therein."[12]  *Id.*  The policy also insures against loss incurred because of the unmarketability of the title.  *Id.*  The 7-A Administrator was not listed in the Schedule A, but the interest is vested in him, as a "person in possession."  *See Zev Cohen, supra*.

The FDIC asserts that AmTrust did not know about the 7-A administrator.  The third-party purchaser discovered it on or about October 29, 2004.  ECF No. 44-9.  Defendant's title report states it was unable to determine the prior insurer to investigate the *lis pendens* action seeking the appointment of an administrator.  ECF No. 44-6.  The effective date of the title report

---

[12]  Schedule A list the insured as OSB, fee simple estate or interest, and the estate or interest is vested in Carlos J. Timentel (the purchaser).  ECF No. 1-4.

27

(1:08CV2390)

was February 14, 2003.  *Id.*  The title policy does not expressly exclude a 7-A administrator.

ECF No. 1-4.  The title policy only list two express exceptions in Schedule B:  "(1) survey

exceptions set forth herein; and (2) any covenants and restrictions of record."  *Id.*

> The policy at issue contains an exclusion for the following:
>
> Any law, ordinance or governmental regulations (including but not limited to building and zoning laws, ordinances, or regulations) restricting, regulating, prohibiting or relating to (i) the occupancy, use, or enjoyment of the land; (ii) the character, dimensions or location of any improvement now or hereafter erected on the land; (iii) a separation in ownership or a change in the dimensions or area of the land or any parcel of which the land is or was a part; or (iv) environmental protection, or the effect of any violation of these laws, ordinances or governmental regulations, except to the extent that a notice of the enforcement thereof or a notice of defect, lien or encumbrance resulting from a violation or alleged violation affecting the land has been recorded in the public records at Date of Policy.

*Id.*  The title commitment identifies two valid *lis pendens* that relate directly to the appointment

of the 7-A administrator, both of which were in effect at the time the policy was issued.  ECF No.

44-6.  The alleged violations were of public record prior to the date the policy was issued.  The

evidence proves not only that Defendant should have been aware of the appointment of a 7-A

administrator, but also Defendant was aware of the appointment.  Defendant has taken several

actions regarding the appointment before and after the issuance of the policy.  Accordingly, this

specific exclusion is not applicable in the instant case.

### b.  The Value of the Loss

A policy of title insurance is an indemnity against loss that results from one of the

covered matters.  *L. Smirlock Realty Corp. v. Title Guar. Co.*, 52 N.Y.2d 179, 418 N.E.2d 650

(1981).  The "title insurer's obligation to indemnify is defined by the policy itself and limited to

28

(1:08CV2390)

the loss in value of the title as a result of title defects against which the policy insures." *Citibank v. Chicago Title Ins. Co.*, 214 A.D.2d 212, 221, 632 N.Y.2d 779 (1995). Defendant argues that the FDIC has not suffered a loss as a result of a covered matter. ECF No. 53 at 6. Defendant asserts that the 7-A administrator is the result of the condition of the property, and the condition of the property is the reason the property has a diminished value. ECF No. 53 at 7. The Court has previously concluded that the appointment of a 7-A administrator is a covered matter.

The FDIC argues that Defendant, instead of removing the defects, hired counsel to develop facts in an attempt to reduce the amount of Defendant's liability. Defendant's counsel admits that Defendant retained him to assist in removing the property from 7-A status. ECF No. 44-14. Counsel for Defendant stated that the property was appraised for $360,000 in March 2006. *Id.* Counsel stated that its purpose was to negotiate a sale of the insured premises and pay the Insured the difference in the appraised value and the amount the property sells for. *Id.* An architect's report has shown that it will cost at least $400,000 to make necessary repairs to the property. *Id.* Defendant's counsel also states that "[t]here have been recent offers to purchase the property, including the 7A administrator himself who offered $250K to purchase the insured premises." *Id.*

Defendant now argues that its obligations under the policy are $110,000 because it allegedly received an offer from a New York developer to purchase the property for $250,000. Defendant asserts that it is responsible only for the difference between its own appraisal of $360,000 and the unsubstantiated purchase offer of $250,000.

29

(1:08CV2390)

### c. Whether the FDIC can Collect on the Loss

Defendant argues that MERS is the party entitled to enforce the note and mortgage because it was the plaintiff in the foreclosure.  ECF No. 38 at 28.  Defendant relies on *In re Foreclosure Cases*, No. 1:07CV2282, 2007 WL 3232430 (N.D. Ohio Oct. 31, 2007).  Defendant asserts that under the provisions of the title insurance policy, the insured party is the party entitled to enforce the mortgage.  ECF No. 38 at 28.  The FDIC argues that the fact that MERS brought the foreclosure suit is moot because MERS acted as Nominee for OSB and its successors, and AmTrust is the successor of OSB.

Section 1821(d)(2)(A), 12 U.S.C. provides:

> Successor to institution.  The [FDIC] shall, as conservator or receiver, and by operation of law, succeed to-- (i) all rights, titles, powers, and privileges of the insured depository institution, and of any stockholder, member, accountholder, depositor, officer, or director of such institution with respect to the institution and the assets of the institution; and(ii) title to the books, records, and assets of any previous conservator or other legal custodian of such institution.

The FDIC is now acting as receiver for the failed bank, AmTrust; thus the FDIC is the successor of OSB's interest.  ECF No 51 at 13.  *See US Bank N.A. v. Flynn*, 27 Misc.3d 802, 897 N.Y.S.2d 855, 859 (2010) (holding that MERS "as nominee, to prosecute a foreclosure action where the mortgage indenture at issue confers upon such nominee broad powers to act as the lender or its successors and assigns may act.").  Defendant asserts it requires sworn proof of loss, but claims counsel for Defendant, Alyssa Esteves, testified that she had handled over 1000 claims and never received anything like a sworn affidavit form.  ECF No. 42-1 at 89.

Accordingly, the Court grants the FDIC's Motion for Summary Judgment in regard to Count II; and denies Defendant's Motion for Summary Judgment as to Count II.

(1:08CV2390)

## B.  Extra-Contractual Damages

### 1.  Bad Faith Denial

In Counts III and IV, the FDIC asserts a tort claim of bad faith refusal to satisfy an insurance claim.  ECF No 1.  New York law, however, does not recognize a tort of bad faith denial of insurance coverage.  *Polidoro v. Chubb Corp.*, 354 F.Supp.2d 349, 352 (S.D.N.Y. 2005) ("Plaintiff's claim for bad-faith conduct in handling insurance claims is not legally-cognizable under New York law."); *see also USAlliance Fed. Credit Union v. CUMIS Ins. Soc'y, Inc.*, 346 F.Supp.2d 468, 470 (S.D.N.Y. 2004) ("Plaintiff's claim for bad faith denial of coverage is crafted as an independent cause of action in its complaint but, as the Defendant correctly points out, an independent tort action for bad faith denial of insurance coverage is not recognized in New York."); *accord Cont'l Info. Sys. Corp. v. Fed. Ins. Co.*, No. 02 Civ. 4168(NRB), 2003 WL 145561, at *3 (S.D.N.Y. Jan. 17, 2003).

### 2.  Punitive Damages

As stated in *New York Univ. v. Cont'l Ins. Co.*, 87 N.Y.2d 308, 662 N.E.2d 763 (1995):

> [D]amages arising from the breach of a contract will ordinarily be limited to the contract damages necessary to redress the private wrong, but that punitive damages may be recoverable if necessary to vindicate a public right.  Punitive damages are available only in those limited circumstances where it is necessary to deter defendant and others like it from engaging in conduct that may be characterized as "gross" and "morally reprehensible," and of "'such wanton dishonesty as to imply a criminal indifference to civil obligations.'"

*Id.* at 315-16 (citations omitted).  The following are the pleading elements required to state a claim for punitive damages as an additional and exemplary remedy when the claim arises from a breach of contract:

31

(1:08CV2390)

> (1) defendant's conduct must be actionable as an independent tort; (2) the tortious conduct must be of the egregious nature set forth *Walker v Sheldon* (10 NY2d 401, 404-405, *supra*); (3) the egregious conduct must be directed to plaintiff; and (4) it must be part of a pattern directed at the public generally (*Rocanova*, 83 NY2d, at 613, *supra*).

*Id.* at 316.

Upon review of the instant action, the Court finds that the FDIC has not sufficiently plead an egregious independent tort directed to it. The actions of Defendant do not rise to the level of egregious. Accordingly, the Court concludes that the FDIC is not entitled to punitive damages.

Accordingly, the Court grants Defendant's Motion for Summary Judgment in regard to Count III and IV; and denies the FDIC's Motion for Summary Judgment as to Count III and IV.

### 3. Consequential Damages

The FDIC asserts that Defendant is liable for consequential damages. ECF No. 44-1. Defendant argues that the FDIC does not allege damages in addition to the contractual damages. ECF No. 48. The FDIC relies on *Bi-Economy Mkt., Inc. v. Harleysville Ins. Co. of N.Y.*, 10 N.Y.3d 187, 886 N.E.2d 127 (2008). In *Harleysville*, the court held that consequential damages are recoverable beyond those provided for in the contract where the denial of the claim is made in bad faith. *Id.*; *see also Acquista v. N.Y. Life Ins. Co.*, 285 A.D.2d 73, 730 N.Y.S.2d 272, 278 (2001) (holding that consequential damages beyond the policy limits are available due to insurer's "dilatory tactics" in "seeking to delay and avoid payment of proper claims"). Consequential damages are designed to compensate a party for reasonably foreseeable damages—brought within the contemplation of the parties at the time of contract formation. The

(1:08CV2390)

damages "must be proximately caused by the breach" and must be proven by the party seeking them.  *See* 24 Williston on Contracts § 64:12 (4th ed).

In determining the reasonable contemplation of the parties, the nature, purpose and particular circumstances of the contract known by the parties should be considered, as well as "what liability the defendant fairly may be supposed to have assumed consciously, or to have warranted the plaintiff reasonably to suppose that it assumed, when the contract was made." *Kenford Co., Inc. v. County of Erie*, 73 N.Y.2d 312, 319, 537 N.E.2d 176, 179 (1989) (citations omitted).

The Court does not decide at this time whether Defendant is liable for consequential damages.  The Court reserves ruling on the matter of consequential damages until after the parties have submitted additional briefing in order not to prejudice the FDIC.  Because the Court found New York law is applicable to the instant case and New York law does not recognize a tort of bad faith denial; the parties may brief this specific issue for the Court to decide if a genuine dispute exists as to a material fact.  The current briefs do not contain enough facts for proper consideration of this claim.

## V.  CONCLUSION

For the foregoing reasons,

The Court grants the FDIC's Motion for Summary Judgment (ECF No. 44) in regard to Counts I and II; and denies Defendant's Motion for Summary Judgment (ECF No. 38) as to Counts I and II.

(1:08CV2390)

The Court grants Defendant's Motion for Summary Judgment (ECF No. 38) in regard to Count III and IV; and denies the FDIC's Motion for Summary Judgment (ECF No. 44) as to Count III and IV.

The FDIC's Motion to Strike Exhibits to Defendant's Reply Memorandum (ECF No. 54) is denied as moot.

The FDIC' supplemental brief on the matter of consequential damages shall be filed on or before October 15, 2012.  Defendant's supplemental brief on consequential damages shall be filed on or before October 29, 2012.

IT IS SO ORDERED.

9/30/2012

Date

Benita Y. Pearson
United States District Judge

34